We'll hear argument next in Case 14-419, Luis v. United States. Mr. Shrebnick. Thank you, Mr. Chief Justice, and may it please the Court. The Sixth Amendment has always recognized the individual's right to spend his own money to obtain the advice and assistance of counsel. At the time of the adoption of the Bill of Rights, that was the core right, a time when the right to appointed counsel had not yet been established by this Court. We submit that the right to representation by private counsel must allow a defendant to use assets which she rightfully owns, assets over which there is no dispute that she has good title, so that she may be represented by the lawyer that she prefers. What do you do about Monsanto? In Monsanto and in Kaplan and Drysdale, those were cases involving tainted funds, drug money. Right. So what is the logic that says it doesn't violate the Sixth Amendment if it's tainted funds, but it does if it's untainted funds? Mr. Chief Justice, the logic is that no one has a rightful claim to drug money. No one can claim a valid property right in drug proceeds. Ms. Luis is wanting to use assets that are not drug money. They are her lawful assets. They are not connected to any crime at all. Kagan. Well, Mr. Shribman, I mean, compare two situations. One is the one that Monsanto talked about, where a bank robber goes in and he has a pile of money now, and Monsanto says, you know, even though he wants to use that money to pay for an attorney, too bad. Now a bank robber goes in, he has a pile of money. He puts it into a separate bank account. He uses that bank account to pay his rent, to pay other expenses, and he uses the money that would have gone for the rent and other expenses to pay a lawyer. Why should the two cases be treated any differently for Sixth Amendment purposes? Because no amount of so-called dissipation, as the government would suggest, negates Petitioner's lawful interest in the property she owns apart from any alleged criminal activity. Well, but doesn't it make sense, the sort of substitution rule? I mean, if you've got $10 million in drug money and you had $5 million and you spend $10 million, you can't say, you know, oh, I spent the drug money, you can't touch the $5 million. It seems to me that's what the statute is doing when it says whatever is a reasonable substitute or assets substituted for. And so, Mr. Chief Justice, of course, if there is a conviction, if the defendant is found guilty, after the conviction, when punishment is determined, there may well be the opportunity for the government to seek punishment that includes the financial penalties associated with the crime. But before that time, pretrial, when the defendant is the exclusive owner of the untainted assets, there is no principle of law that deprives her of the right. But I thought the Chief Justice's question was slightly different. Kennedy, I don't know if you were privileged to hear the exciting argument yesterday on tainted assets. I was. But there are degrees of taint. Can you follow the assets? So just to say tainted or untainted, it's a more difficult question than that. Well, in this case, it's a simple answer, because here we have a stipulation, Joint Appendix 161, that the assets that are the subject of the dispute here today are assets that are undisputedly untainted, not traceable to the crime. They include, for example, family jewelry, not traced to any criminal activity. They include real estate that was acquired before the allegations of the conspiracy. Well, let me go back to Justice Kagan's question and ask it in a different way. So we have two brothers, twin brothers, and they rob a bank. They get $10,000. They split it up, $5,000 each. And on that very same day, it happens to be their birthday, and their rich uncle comes and gives each of them $5,000 as a birthday present. So they go out to party, and one of them, and they both spend $5,000 partying. One of them spends the money from the bank robbery. The other one spends the money that was given to them by their rich uncle. And your position is that the one who spent the money from the so-called tainted assets, the money from the bank robbery, is entitled to use the remaining $5,000 to hire an attorney, but the other one is out of luck. Yes, because the — And what sense does that make? Because the property interest that a defendant has in an inheritance or in a gift, those property rights are not negated simply because the defendant has allegedly committed a crime, simply because there's probable cause. So the law should want this Court to say, spend the bank robbery money first. That's your position. Well, the government is concerned about what we would describe as the so-called wily criminal. The defendant who spends the money, the tainted assets, faces perhaps even more punishment at the end of the day or at the end of the conviction, either through money laundering charges or otherwise. So the Court, keeping in mind that forfeiture has as its primary component punishment, there are ways of disincentivizing these kinds of financial transactions that, Justice Kennedy, you're referring to. But it doesn't affect the defendant's property interest in assets that are wholly apart from any criminal activity. How does — I don't know how these things actually work. I mean, the defendant obviously has daily expenses, and if the government's money is beyond the money she has, does she get an allowance or something? As of now, she gets nothing, Mr. Chief Justice. So if her — putting aside lawyers, if her daughter's tuition bill comes due, she can't pay that? Under the current restraining order, she can do nothing. But she can surely pay the rent or the mortgage. Under the current restraining order, she can do nothing. The statute, as it's being construed by the district court, allows no exception. Kennedy, is your position that the government could prevent payment for the tuition, but not for the counsel? Our position is that there's a constitutional right under the Sixth Amendment to retain counsel. So the answer is you can — the government can stop the tuition payment, but not the payment to counsel. I would think so in those kinds of instances. There may be other cases I concede. If it's life or death matters, life or death expenditures, a different defendant might come before the court and say there's a strong, compelling need for that money for other reasons. But if it's ordinary, routine expenses, our claim today doesn't reach that. Our claim reaches Sixth Amendment issues. So it's — you really don't have a statutory argument. You're making a Sixth Amendment argument, because if it were a statutory argument, it would be you can — you can't restrain untainted assets. Justice Sotomayor, the statute, 18 U.S.C. 1345, which is different than the drug forfeiture statute, 18 U.S.C. 1345, it's at the blue brief at page 2.  Sotomayor, I guess I'm — I understand what you're going to say, because I read your brief. But the logic of your argument would suggest that you can't freeze untainted assets for anything, because you're saying the government has no property right to it, it's untainted, it's your money. It's not their money until they secure a judgment. And so the logic of your position would be, I think, they can't restrain untainted assets, period, constitutionally or statutorily. Well, we don't go that far in our position. I know you don't, because it's very nice that you limit it. But once we announce a rule, we have to carry it to its logical conclusion. And if the rule is it's untainted assets and it belongs to me, how do we then limit it? Well, I suppose that if there's no Sixth Amendment right at stake, if there's no constitutional right to use the asset today, I don't know of any prohibition, provided that there's due process, that would prevent the Court from restraining assets proposed to be used for other purposes. Ginsburg. But you said that this is her property. If it's tainted, you say, she doesn't own it, it's not her money. But if it's untainted, it is her money. So I think Justice Sotomayor has asked a fair question. Isn't the logic of your position that the untainted assets can be used without restraint for whatever she wants to use it for? Justice Ginsburg, from a constitutional perspective, I don't think that that's necessarily correct, because the courts can give injunctive power to restrain assets, even assets currently belonging to the defendant. Our objection is when such an injunction interferes with the constitutionally protected right to retain counsel of choice. And so while the statute could constitutionally allow, provided that there's adequate time for hearings, et cetera, the restraint of even a defendant's owned assets, lawfully owned assets, that principle can't extend to assets, the subset of assets she needs to use counsel of choice. Scalia. What if the woman is a devout Muslim and she makes an annual trip to Mecca every year, wouldn't she have a constitutional right to use the money for that? So certainly she would have a constitutional right, and whether she could then obtain the assets free from the injunction immediately would raise a separate First Amendment question. The Sixth Amendment, because the deprivation will be permanent, meaning we need those assets now before the trial, and the immediacy of the need for those assets. Scalia. Well, she has an immediate need to go to Mecca. I mean, if she doesn't get it now, she's not going to be able to fulfill what she regards as a religious obligation. I don't know how you can limit your principle to the Sixth Amendment. The Sixth Amendment is important in the context of the adversarial proceeding that will determine the ultimate ownership of those assets at the end of the day. And so unlike the First Amendment, unlike any other amendment, the Sixth Amendment is a guarantee that the defendant will be represented at the proceeding where that property and her liberty outstay. And with regard to the travels to Mecca, those travels, while significant under the First Amendment, don't bear on the ultimate outcome of the criminal case. And so because the need for assets that we are requesting, limited to that amount needed to retain counsel of choice, limited to the amount needed to mount a legal defense to the very charge that threatens her property rights and her liberty upon conviction, there needs to be an accommodation so that she can use enough assets, controlled by the court, of course. Kagan. Kagan. Kagan. And, Mr. Shrebnick, this goes back, I think, to the Chief Justice's first question. It seems that the distinction that you're making is one that the Court explicitly rejected in Monsanto. In other words, the Court said the Sixth Amendment here is the exact same thing as the First Amendment. It even used that example that Justice Scalia gave, or that general example. And so it goes back to the Chief Justice's question in the sense of there's a very similar distinction, but it's a powerful intuition that was explicitly rejected by us, and this case doesn't seem to present any different circumstances than that one. Justice Kagan, I think the circumstances are quite different because of the tainted property that was at issue in Monsanto. First, we know it was drug money in Monsanto. It had been established by clear and convincing evidence. In our case, it's totally untainted assets. Second, the Court recognized that a defendant doesn't have a lawful property interest in drug money, no different than a bank robber does not have a lawful interest in the bank loot. Kennedy, but your earlier argument was you have a constitutional right to establish that it isn't drug money. That was your whole answer to Justice Scalia. In this case, there's no dispute that the money is untainted, and I'm not calling you out on that. I'm just asking about the rule that you're proposing. The rule I propose, consistent with the Court's observation in Cayley, there are two elements to establish forfeitability. One, that there's a crime committed, and second, traceability, from the majority opinion in Cayley. Here we have undisputedly untainted assets, not traceable to a crime. In Monsanto, the assets were drug money, and a defendant doesn't have the right to use drug money to represent to be represented by the counsel of his choice. Roberts, I guess your – I think this may be Justice Sotomayor's point. Your argument, you're distinguishing tainted and untainted assets, and I understand that. I just don't understand that if you can freeze the assets despite the Sixth Amendment when they're tainted, I don't understand why it's not the same rule when they're untainted. You may have statutory arguments, but if you have arguments, it has nothing to do with the constitutional right to counsel. Mr. Chief Justice, I think it has everything to do with the Sixth Amendment, because at its inception, the Sixth Amendment only encompassed the right to spend one's own money to be represented by counsel. There was no right to the appointment of counsel. So taking away the defendant's lawfully held assets, whether it be their pension funds, whether it be an inheritance, whether it be their lawfully earned labors, to take that away at the inception of this nation would have meant the defendant would have been left with no counsel at all, since the notion of an appointed lawyer is really a notion of more recent vintage in the 20th century. So indeed, to take away the property rights pretrial of a defendant at the time when he or she is under indictment, needs those assets to retain counsel, any private counsel. So we're not talking in this case about a particular. Scalia. Well, what if the prosecution brings a case for crime X and wins that case and imposes a fine that takes away all of the defendant's assets, and then the prosecution brings another case for crime Y? Would you be arguing that the fine had to make an exception for the defense of crime Y? No, Justice Scalia. What's the difference? There's a judgment. Upon judgment, a defendant can lose his right to property upon execution of that judgment. So the government could execute on that criminal judgment and take as much of the defendant's assets needed to satisfy the fine. Our objection is to the government doing it before conviction, before there's been any judgment, locking down somebody's assets at the very moment when he or she needs those assets to exercise the right to counsel as it was envisioned. The Sixth Amendment only protects your money up until the point where there's a judgment. Yes. But in this case, there was a finding of probable cause. Yes. So you want us to make a distinction between probable cause and a judgment? Yes. Every case, every indictment brings with it a finding of probable cause. It's a — the two rights have to coexist. The right to be represented by counsel of choice under the Sixth Amendment has to coexist with the indictment, because under Patterson v. Illinois, the right under the Sixth Amendment is triggered by the indictment. It's triggered by the finding of probable cause. To then say that probable cause destroys the right to the Sixth Amendment is to then say that they don't coexist, but of course they do, because the Sixth Amendment was established in 1791 and it's part of our fabric. I might just be repeating myself, but I thought that, again, that distinction was the one specifically rejected in Monsanto. I mean, Monsanto could have said Kaplan and Drysdale is different because it's post-conviction. But Monsanto refused to say that. Monsanto said, same rule that applies post-conviction ought to apply upon a finding of probable cause. Yes, Justice Kagan, but probable cause to believe the assets are tainted, probable cause to believe that the drug money is not the defendant's to spend, not probable – there's no probable cause here as to these assets that Ms. Luis proposes to use to retain counsel of choice. Alito, the problem with this argument is that as a matter of economics and common sense, money is fungible. To say if the so-called tainted money has been spent and what's left is the untainted money, it doesn't make a difference which pot has been spent and which pot hasn't been spent. Respectfully, Justice Alito, it makes a major difference. Our property laws, while money in some instances is fungible when they're commingled, if there is segregated property, when creditors try to levy against property that's not part of a secured interest, the law treats it very differently. Well, yes, but there's all sorts of complicated rules in those areas. I mean, let's – suppose you have, and none of that necessarily applies here. Suppose you have the situation where what's at stake is money that's going to be used for restitution, all right? So at the beginning of the case, the question is whether the defendant can spend that money to hire the attorney of the defendant's choice, which is certainly a very powerful interest, or whether that money at the end of the case, if there is a conviction, is going to go to the victims. So how do you – how do you try to accommodate those two interests? Well, to provide a restitution exception would just swallow the entire Sixth Amendment out of the Constitution for the following reason. In most cases, a victim has sustained an injury. It might be property damage. It might be personal injury. And if, for example, to use a hypothetical, if someone were to steal the Mona Lisa or allegedly steal the Mona Lisa, but the Mona Lisa isn't found, there's no principle this Court has ever announced. Alito, your answer is that the defendant's right to hire counsel of choice takes precedence over the rights of the victims. And you would say that no matter how strong the proof is? Yes. No matter how strong. Until there's a verdict. As long as the assets that the defendant proposes to use are her lawful assets, untainted, not connected to the crime, not traceable to any criminal activity, yes. Because that seems to me not a very – I don't know – not a very persuasive line. You're relying on property law. What you're saying is the government can take away all your money if it's tainted, if there is probable cause to believe that it's tainted, right? It can take away all of your money if there's a judgment. But it can't take away all of your money if there's simply probable cause to believe that you're going to owe this money. Right, Your Honor. That seems to me a very, I don't know, not an evanescent line. I don't see why the Sixth Amendment case is – the property case is stronger in one situation than the other, but I'm not sure that the Sixth Amendment case is any stronger. What the statute is purporting to do is give the government a pre-judgment attachment on the defendant's assets based on a projected judgment. That's right. It's property law. And the Sixth Amendment – You're complaining about property law, not the Sixth Amendment. Well, I'm complaining that the Sixth Amendment, because at its root contemplated the use of property to retain counsel, the two in some degree are interrelated, of course, because without money 220 years ago or so, you couldn't hire a lawyer and none would be appointed for you. So while the court has accommodated the indigent by providing them with appointed counsel, that is not a license for the government to render people who are not indigent indigent. It's not a license to impoverish them by virtue of the accusation alone. That would simply write out the Sixth Amendment from the Constitution. In every single case where there is a victim who claims injury, every single one, the government has by definition probable cause because the indictment is based on probable cause and it's not subject to challenge under the Cayley opinion. And so if we are going to say that merely being accused in this country because a grand jury has found probable cause is now sufficient to lock down all of your assets, assets you have owned for decades perhaps, because at some future time maybe a jury will convict and maybe a judge will enter a judgment and then maybe the court will then have to enforce that judgment, really is to write out the Sixth Amendment. And there are ways, if the point of a criminal case is to inflict punishment on a defendant, there are ways other than financial means to do so. Of course, incarceration is the number one form of punishment. And while the needs of the victims are certainly important, what we're asking here is to accommodate both. We're not asking that all the funds be released, only so much as are necessary so that the accused can be represented by private counsel. Sotomayor, I know this is not part of the question asked, but I know that it's suggested in the fringes of the briefs. How does the district court ensure that she doesn't use every penny for defense costs when the district court thinks that that's not reasonable, for example? I don't think there's an issue, particularly in this case, with that issue, because the court, which now has control over the assets, would manage the disbursement of funds for counsel. And the bar rules would apply, just as with a CJA-appointed lawyer, Criminal Justice Act-appointed lawyer, goes to the court and says, here are my hours, here's what I need for investigation, here's what I need for support services for discovery. That would be managed by the district court. Roberts. You're not looking for CJA rates, are you? No, we're not, Justice. I need nothing to suggest that. We're not. And so given the ability of our district courts to manage those issues, the only standard we would ask for, that they be reasonable and bona fide, and the bar rules govern that. I should add that while we are having an academic discussion here, it didn't seem to be such a controversial proposition to the government when in Kaplan and Drysdale, in their brief, they wrote the following. The Constitution requires that a court afford a defendant a fair opportunity to secure counsel of choice using whatever assets he has at his lawful disposal. That's the brief of Kaplan and Drysdale by the Solicitor General at page 42. And so when the Solicitor General's office argued this case in Kaplan and Drysdale 25 years ago, they came to the court and said there was a difference between tainted and untainted assets. And some 26 years later, those are being conflated as if there is no difference between the two. Sotomayor, this statute came later and it says substitute property. That is true. So there is a statute, the statute that's at issue in this case, different from 853. 853 in most circuits does not authorize the pretrial restraint of untainted assets. So all the concerns about victims, all the concerns that emanate from the questions that have been asked today, Congress struck that balance and did not allow for the restraint of substitute assets, at least in most circuits as it's been interpreted. The Solicitor General has a different view of the statute as it expressed in the Fourth Circuit. But in all events, though the victims are certainly to be accommodated, so do the rights of the criminal defendant who needs to be represented by the counsel of choice. But Congress seemed to have singled out these banking frauds and health care frauds for special treatment, so they are not governed by the general forfeiture statute, which makes the distinction between tainted and untainted. They seem to want to come down very hard on these two crimes. So why would we interpret, was it 1345, as doing nothing, as being controlled essentially by 853? So 1345, although it doesn't use the word forfeiture, it doesn't say what happens to these assets. It simply locks them down, so to speak, until something happens. It doesn't even talk about a criminal case, but it is in the context of Title 18. And the one-court Fang case talks about there needs to be some sort of criminal procedure that follows the lockdown. And, Justice Ginsburg, while Congress may have given in this instance the ability of the government to restrain assets of equivalent value, notwithstanding our statutory interpretation argument, it still needs to accommodate the rights of the criminal accused. If I may reserve the balance of my time for rebuttal.  Roberts. Thank you, counsel. Mr. Dreeben. Dreeben. Thank you, Mr. Chief Justice, and may it please the Court. I think that the appropriate starting point for this case is the last sentence of Monsanto, not because Monsanto specifically addressed substitute property, but because it adopted a principle that I believe resolves this case. And the last sentence of Monsanto says, If the government may post-trial forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, after probable cause is adequately established, the government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial. Roberts. Well, that was said in the context of the government's submission that there's a difference between tainted and untainted, right? Your argument in Monsanto focused on the tainted aspects of the proceeds. Yes, it did. And that's why I say that the principle that the Court articulated in that sentence is what decides this case. Why is that the principle? The principle there talking about money that doesn't belong to the defendant. It belongs to Smith or Jones or the bank. Now, let's try that principle in a case where it's the defendant's money. The principle is that the government, without proving that he's guilty of any crime beyond a reasonable doubt, can take all his money, all, because he might be fined. I've never heard of such a principle, frankly. I've just never heard of it. Now, if there is some case that says without the amendment or not, hmm? Now, I can imagine, I can go from there and find interest on both sides, da, da, da. Sotomayor, I think that it's important to start with, actually, the principle that Monsanto adopted, not because it resolved the factual circumstances here, but because it's talking about the point in time after the government wins a judgment. And the principle is that if the government will have a right to forfeit that property at the end, if it can show probable cause. Breyer, I understood that. I just wanted to try it with the facts here. I mean, the first principle is if, in fact, the defendant has somebody else's money that he's taken unlawfully and he has to give it up at the end of the trial, we can make him give it up at the beginning to be sure it's there. Now, let's try it with facts here. If a defendant has some money, which maybe he'll have to pay in a fine, what we'll do is we'll take all his money away before he's been convicted beyond a reasonable doubt. Okay? That's the difference in the propositions. And I'm saying it's pretty hard for me to think in a country which says that before he's convicted, you have to release him on bail, except in unusual circumstances, that nonetheless you can take all his money away, so he can't hire a lawyer. I know that's a little simple-minded, but nonetheless, that seems fairly basic. I don't know where it comes from. So, Justice Breyer, I think that the embedded premise there is that people will not suffer restraints on their liberty or property before they're being convicted beyond a reasonable doubt. That's correct. That is the principle, and now we make a number of exceptions. And one exception is if you think he's going to run – I mean, I can think of exceptions where we do keep people in jail. That's, of course, right. And here, what they're saying, I think, in essence, is let's try and think of an exception for this one. Pretty hard. And anyway, if there is one, what he wants to use the money for is to make sure he has a lawyer. It's called the Sixth Amendment. All right. Now, there we are. That's where, at this moment, in my mind, that's where the case is. All right. So can I try to break that down a little bit? Because I do think that the principle in Monsanto is critical. The principle in Monsanto is that if the government will be able to forfeit the property at the end of the day, it has an interest in ensuring that it is available and not dissipated. It's the monetary equivalent of flight. It's asset flight. And this statute, Section 1345, was specifically designed, as Justice Ginsburg observed, for crimes in the banking and in the health care context in which money flows into accounts, money is fungible, very difficult to justify. Breyer. And I think that's what you say is, look, this is equivalent to the case where we keep the guy in jail because he might run away. That's your point. That's not a bad point. So I have on that on one side, and I have on the other side that he would like to have a lawyer, which is the Sixth Amendment right. So I have a suggestion that I want you to focus on. The suggestion is that let's read this statute in light of what you've said, that there is an interest on your side and there is a constitutional amendment on the other side. Why can't we read this statute to say they accommodate those interests in this way? If they're going to run away with the property, then the court has the authority to enjoin the alienation or disposition of property, say, taint it. Then you can ask for a restraining order to prohibit the prohibition, not just of the tainted property, but also of property of equivalent value. If I read that without knowing the background, I would say a lot of cases come up where you get TROs, where they're not precise because you don't know exactly what property you're talking about. So what do you think about reading this statute to avoid the constitutional question, to say the TRO means TRO, and a TRO means where there's some property out there and it may be tainted, mixed up with the untainted, you can get a TRO on the whole thing, you have to have a speedy hearing, he has to be represented, and what your purpose of that is to separate the two kinds of assets. That seems to me to work for the purpose and it also avoids the constitutional question. Dreeben. Dreeben. Dreeben. So two things on that. I hope I get a chance to say both of them. First, I don't think that it is a serious constitutional question in light of Monsanto. So I don't really think that there's a serious avoidance concern here. Monsanto basically said that if the government has shows adequately that it will be able to forfeit the money at the conclusion of the case, the Sixth Amendment doesn't override the government's interests. After all, Justice Breyer, this is basically a zero-sum game. Either there will be money available at the end of the case for the victims or the money will have been spent on lawyers. And Congress made a judgment that the government can't come in in every case and simply restrain assets upon a showing of nothing, but it does have a statute in a very specific area that allows it to try to. Kennedy, what is it that confines your rationale to a specific area? It seems to me that if the government prevails in this case, every State in the union, every locality, could say that in the event of assault and battery, malicious mischief, a drunk accident caused by drunk driving, and any crime involving a bodily injury, that the government is entitled to restrain disposition of assets that might be used for medical care, for pain and suffering, and this would, in effect, prevent the private bar from practicing law, unless it did so on a contingent basis. Justice Kennedy, it's correct that our principle is not limited to the types of crimes that are in this case. It is limited to the government making an adequate showing that at the conclusion of the case, it will have the right to the money. Kennedy, you're talking about probable cause on top of it. I understand. But the government can often show probable cause, and that's usually the basis for the indictment. That's correct. And I, again, I think that Monsanto resolved this question by saying that if the government can take title to the property at the conclusion of the case, it has an interest in ensuring that it is available and the Sixth Amendment doesn't override. And it takes the ‑‑ it establishes that right in the same way as the issue here without counsel on the part of the defendant, because I assume Cayley applies to untainted assets as well as tainted. That's correct. So to add to the context of what Justice Breyer was expressing concern about, you not only can do that, you can do that without giving the defendant any type of hearing, right? No. I think the defendant is often entitled to a hearing. The question is what issues the defendant may raise at the hearing. Here, for example, there was clearly an issue of whether the defendant was in fact dissipating assets, and that would have been something that the defendant— Roberts I thought under Cayley the defendant didn't have to be provided a hearing with respect to the pretrial seizure of assets. With respect to whether there's probable cause to believe that the defendant committed an offense. That's what Cayley said is controlled. Cayley was a question of tracing, because it was— It was, Justice Sotomayor, and that— But you don't have any tracing problem here. As soon as he commits a crime that you say was worth $45 million, you can freeze $45 million worth of assets, correct? Although there were far fewer here because most of them had been dissipated. And I think that the reason why— I respect that, but you agree that these particular funds were untainted. I'm told by your adversary that some— We stipulated, it's technical, but we stipulated that there may be some unquantified amount of untainted assets in the assets being restrained. We did not know and did not attempt to figure out, and that would be an issue for a later day, if the Court said that that mattered. Mr. Dreeben, I think, you know, in essence, your argument goes like this. You have Monsanto. You combine Monsanto with a simple factual acknowledgment that money is fungible, and it gets you to a judgment in this case. You win, the Petitioner loses. And, you know, that's a fair, strong argument, if one is comfortable with Monsanto. I mean, there is — so I think I'll just ask you. I mean, suppose the Court is just uncomfortable with the path we started down the road on in Monsanto. And you might be right that it just doesn't make sense to draw a line here, but it leaves you with a situation in which more and more and more we're depriving people of the ability to hire counsel of choice in complicated cases. And so what should we do with that intuition that Monsanto set us down the wrong path? Dreeben, I think, you know, in essence, your argument goes like this. Well, I would hope that the Court sees that even if there are some uncomfortable aspects of Monsanto, it actually rests on a sound legal judgment. And I realize I have said this, but I will keep coming back to this, because I think it is the touchstone for Monsanto. Kaplan v. Drysdale was a post-judgment case, and it said, once these funds are forfeitable, the defendant, if he pays his lawyer with them, is paying the lawyer with somebody else's money. Namely, the government. Then the question is, can the government do anything to prevent dissipation of the assets before it obtains the judgment? And the Court said, not automatically, not as a general rule, it can always come in and say, this is what we want, this is what we get. But with an appropriate hearing, the balance of interest does permit the government to preserve the equities. Now, this has an effect on counsel of choice. It has no effect on the ability of the defendant to be represented by counsel. So how do I know how these things work? Let's say you get an order freezing the assets, and it's $10 million, and the defendant comes into the court, whatever, and says, look, my lawyer is going to cost $100,000. 1 percent of the assets that are at issue here. Then you would argue, no, even though it's only a tiny fraction of what we're seizing, the Sixth Amendment doesn't even entitle him to 1 percent of the assets that might end up being forfeitable? Dreeben. Yes. I don't think there is an exception in the Sixth Amendment. Now, this is a statute in which the government proceeded through seeking a civil injunction and restraining order, and the district court does have discretion. It's not a flat rule that forbids the district court from releasing funds for counsel. How does it work? Like the, you know, the daughter's tuition bill comes due, you know, and it's whoever you know, who knows how much these days, $60,000, and the defendant cannot pay that? Not as a matter of right, but this is a civil statute in which the judge can exercise  Well, why would it be, if he can exercise equitable discretion for the daughter's tuition, why not when the Sixth Amendment is at stake? And, you know, counsel of choice, it turns on that. It would seem to me that if there's going to be a case in which equitable discretion will be exercised, it ought to be in that situation. Well, I don't think automatically so. I mean, here the judge said one consideration is will the defendant have representation in the 1345 proceeding itself. The defendant did. Mr. Shrebnick represented the defendant in that proceeding, so the court said, I don't need to worry about that. Then the court turned to the question of whether the defendant needed counsel in the criminal case and said the defendant will be afforded counsel in the criminal case by appointment if necessary. Breyer, you had two responses to my reading of the statute. I heard the first and I didn't hear the second. Let me remind you where we are. But I want to say it because maybe you can focus on this. We're in before the judge on a TRO. Our object of the TRO is to separate the assets that are not this man's from the assets that are this man's. So we do that separation. Now, we say $10,000 is not his, it's the bank's. $15,000 or $10,000 over here is totally his. He's never been convicted of the crime. Now, what's the government's interest? And why can't he take this other, once we've had the TRO, to separate? So, Justice Breyer, I think I need to stop you here because it's not a TRO. The statute does not refer to it as temporary. I know. It says restraining order. That's correct. And my suggestion is we read those words, restraining order, as temporary restraining order, which 3b, it seems to me, clearly permits, but we can get into that argument. I'll worry about that later. I want to know what your second response was to that. My second response is that this is a statute that contains two basic provisions. I think Petitioner describes it accurately. Section A describes the things the government can seek under the statute. Subsection B describes the procedure that's used. Subsection A first allows the government to get an injunction against fraud in A1. In A2, it allows it to restrain assets as the ultimate object of the suit, not as a temporary interim measure. Temporary interim measures are described in subsection B, where it specifically allows the court to impose various restraints until the court has concluded the proceeding. So it addresses temporary relief in B. Subsection A2 describes the things that the government can seek as the ultimate object of the case, injunction against the person who has the funds or a restraining order against any person to restrain the funds that are derived from illegal activity or funds of equivalent value. And just to make one final point on that, the reason that makes sense in a banking context and in a health care context is dollars are fungible, as Justice Alito said earlier. They'll flow into an account. They will flow out into other accounts. It's difficult to trace them. So Congress obviated the need to do that by saying, you can restrain the defendant, but we're not going to rely only on restraining the defendant. You can also restrain the banks where the funds are, and you can restrain them not only in the amounts that represent the tainted funds, but represent the monetary equivalent of them. So in a sense the statute negates the premise that there is a clean line between tainted funds and untainted funds. The money is fungible. Once it's been received by the defendant, there is Medicare fraud if the government establishes probable cause, and its financial interest is ensuring that it can have a judgment to make whole the Medicare trust fund or other victims at the conclusion of the case. Alito, I'm troubled by this statute. I can't understand the difference between A and B. I don't think the issue was not raised in the cert petition, and I don't know whether it can be brought in with the doctrine of constitutional avoidance, because it really has nothing to do with the Sixth Amendment. This would apply regardless of whether there is any Sixth Amendment issue in the case. But having said that, Mr. Shrevenick can address those and rebuttal if he wishes to. But having said that, if B does not refer to a temporary form of relief, then, which I understand to be your argument, then I don't understand what A contributes. Dreeben So A-2 has two different sections, and it describes what the government can seek as the ultimate relief in the case. This started out as an anti-fraud injunction statute. Somebody is going around with a boiler room operation or a Ponzi scheme. It takes a while to get the evidence to indict. The government can come in and seek an injunction to prevent further fraud. Then Congress added A-2 on the theory that there is something else the government needs to do, ensure that money is available at the conclusion of whatever parallel criminal case or civil fraud case the government brings. Breyer And so what they can do is this, if we read this literally under B, that Mr. Smith is indicted for a banking law violation. He has $100,000 of other people's money. The government can say that the order, the restraining order of the court, which prohibits his wife, any other client, the milkman, anyone in the world, from taking not the $100,000 that belongs to the bank, but any other $100,000 that he got for any other purpose, I guess including his retirement fund, including no matter what. I mean, that is goes, it seems to me that's what it says, any other person from taking property of equivalent value, and he hasn't been convicted of anything. Dreeben Yes, but it's referring, again, to a person who has, there is probable cause to believe, has obtained money as a result of a criminal violation, and then it provides a mechanism for restraining it. It's not aimed at restraining people who have nothing to do with the case, unless they're holding the defendant's money. Breyer This is, this is, the defendant's, not the money obtained as a result of the violation. The money he didn't obtain, that's what this case is about. Dreeben Innocent money versus tainted money all depends on a theory that they are economically pure. Now, the only argument that Mr. Shrebnick made to distinguish them, and I realize there may be members of the Court who think this is not a very good argument, and maybe the question is whether Monsanto is at root problematic, but at least insofar as that argument goes, it's based on a reading of the Relation Back doctrine that's contrary to this Court's cases. Monsanto itself made this very clear. It said that the government can restrain money that will become the government's property at the conclusion of the case. Sotomayor Mr. Dreeben, you're taking Monsanto out of context, because 853, by its nature, was limited to tainted funds. This is the first statute that I know of that permits the government to come in and take untainted funds. The incidence of the tainted funds concept was you can't spend another person's money. You stole this money somehow, and you can't spend that money because it belongs to someone else that really doesn't belong to you. But it's not until a judgment, and this is what your adversary is trying to say, that the money that's untainted, the money that or the property that he bought before this crime, this untainted property becomes yours. It's not until that moment, the judgment, that the property is forfeitable. Sotomayor Well, that's true. Sotomayor You can't forfeit it beforehand. Sotomayor That's true for all money, tainted and untainted. Sotomayor Well, but still the question becomes, is there a substantive difference? And I think Justice Breyer is expressing the problem with this, as Justice Sotomayor said, this intuitive sense, which is where do we draw this line? So does the right to counsel have any meaning anymore?  Sotomayor Frankly, I expect within 3 to 5 years, if we rule in your favor, 853 will be changed to have this same language. Dreeben So 853, Justice Sotomayor, does permit forfeiture of substitute property. Sotomayor Yes, but not pretrial. Dreeben Not pretrial. This statute is different because it has a different function and a different purpose, but the basic concept of forfeiture is punishing the defendant by taking money through forfeiture that's equivalent to the tainted property if the tainted property is gone. That's the policy behind it. Now ---- Sotomayor But that's true of every judgment. Dreeben It is true. Sotomayor Every judgment gives you a right to substitute property of some sort. Dreeben Yes, but the point is that the tainted property and the substitute property are similarly situated at the end of the forfeiture case. The government has a property right in each of them. I don't think the property right is really the essence of what's going on here. The fact that section 853 permits pretrial restraint of tainted property, but it doesn't reference the subsection that deals with substitute property, is a feature of that underlying point, which is that if the government is going to be able to collect on its forfeiture judgment, sometimes it will need to restrain property. Monsanto recognizes that. And I don't think that saying that the defendant has an interest in paying for counsel trumps the government's interest in being made whole at the conclusion of the case. Other ---- Scalia When did the ---- when did the ---- when was the first statute that allowed the government to restrain the expenditure of tainted funds? Does that go back a long time? Dreeben Well, the whole history of impersonum forfeiture was dormant until 1970, and then Congress passed a statute that permitted this kind of activity. It improved the statute in 1984 to remedy defects in the pretrial restraint of assets. So it was relatively recently developed, targeting basically drug conspiracies and organized criminal activity. Scalia And the first time Congress ever applied it to non-tainted property was what year? Dreeben Well, the substitute assets provision was added to the basic forfeiture statute, and it was there at least by 1984. I think that it may have been earlier as well. This provision is different, as Justice Sotomayor pointed out, from the basic forfeiture statute in permitting pretrial restraint of any assets, but I think that it reflects the same basic underlying idea. Kennedy And that's the ---- Kennedy But just to be clear so that I understood your earlier answer, the consequence the necessary consequence of your position is that any State in the union can provide for forfeiture or freeze of assets, pending trial, in any assault and battery case, spousal abuse case, criminal negligence, date rape cases, in order to make the victim whole, to pay for medical costs, to pay for pain and suffering, and can freeze those assets, even if the consequence of that is that in most of those cases, most people cannot afford counsel. Dreeben So if at the conclusion of the case, Justice Kennedy ---- Kennedy And that's the consequence of your argument. Dreeben Well, I think that if there is a ---- yes, if there is a monetary assessment that will become provable at the conclusion of the case and the government can show a need to preserve the assets so that they're available. I mean, think about the cases that you're talking about, Justice Kennedy. There are cases in which victims have been harmed. Serious medical costs may be at issue. If the funds are spent on an attorney, they will not be available for compensation of the victim.  Well, and there are all cases in which the defendant has not been found guilty. And in all those cases, I mean, all you have to do, all the governments have to do, all the State governments have to do, is provide for a fine and argue then, well, unless we don't freeze the assets, there won't be money left to pay a fine. So this could apply to, I guess this is the point, this could apply to every crime on the books. Dreeben I do think the Court could draw distinctions among the types of fines and the purposes of the fines that are at issue. So it's not the case that the State government has not been able to do that. Breyer. Have you seen the judgments in the fraud on the market cases? I mean, it isn't too tough in cases involving fraud on the market to find judgments of tens or hundreds of millions of dollars. I mean, judgments in fines after conviction, and that's what I think the question is. The principle of constitutional law that you're advocating would, in fact, permit the freezing of what might be paid afterwards in a fine, which could be a huge amount, before the person is convicted. Am I right? Dreeben So, well, I do think that I was trying to say to the Chief Justice that there could be distinctions that are drawn among various monetary exactions. I think the strongest case is when victim compensation is at issue. All of the money in the context of a Medicare fraud case like this, although it's not required by statute, it will be returned to the Medicare Trust Fund. This is a fraud against the people. $45 million is obtained, we allege, by fraud. Roberts. It goes to the Medicaid Trust Fund? Medicare Trust Fund. We will provide it to the Medicare Trust Fund, yes. Does that go to the victims in this case? Well, the Medicare Trust Fund, which represents basically the fiscal interests of the people of the United States, is the victim. I'm sorry? The Medicare Trust Fund, from which the funds came that we say are obtained by fraud, is the victim. So the funds will be returned to the victim. That's the purpose of trying to freeze the funds in a health care case so that they can be returned. Mr. Dreeben, you're saying that your view, your interpretation, your reading of the statute is the only tenable one, that if one took the view that Justice Breyer's interpretation, that restraining order means a temporary restraining order, or it was another interpretation put forth in the Americans for Forfeiture Reform brief, which is if a judge were to take the position that all three are plausible reasons of the statute, but we'll pick the one that allows the defendant to have counsel. So, Justice Ginsburg, we don't think that any of the alternative readings are plausible. For the reasons that I explained to Justice Breyer, this statute doesn't limit the restraining order to temporary relief, nor would it make any logical sense to do that, because the purpose of this statute was to preserve funds so that they'd be available at the conclusion of the case. I also think that the amicus argument is not a tenable one, because it simply reads or equivalent value out of the statute and without any reference to the context of the statute, which is to try to make the government be able to be made whole at the conclusion of a case if, in fact, it obtains a judgment given the very difficult process of segregating out money in banking and financial-type crimes. Kagan. Kagan. I'm going to go to Justice Alito's questions about your interpretation of the statute. I think what Justice Alito was suggesting was that 828 would be completely subsumed by 828B on your interpretation, and I don't think that you got around to answering that question. So I think that that is true. I think this Court understands from arguments last week that superfluity is no stranger to congressional statutes. They do have a different focus, though, and I think it was quite reasonable for Congress to make clear what that focus is. 2A is aimed at the person who's doing the dissipating themselves, the person who obtained the property by fraud, and B expands that out. Kagan. No, but in just saying that, you are essentially saying, yes, B expands it out, meaning it covers everything that A covers and some more. Yes, but it's not that this is a statute that anyone's reading gives all provisions effect, because the B section, 1345B, permits restraining orders or prohibitions during the course of the case as are needed to protect the United States against a substantial injury. So that provision would subsume the reading that my friend gives.  Kagan. No. I don't think there's any reading of this statute that exempts counsel. It does give discretion to the district court to entertain arguments. Those arguments were made here and rejected. Roberts. Thank you, counsel. Mr. Srebnik, you have four minutes remaining. Thank you, Mr. Chief Justice. I think all of us who heard the argument of Monsanto and Kaplan and Drysdale when it was delivered in 1989 understood the line was drawn between tainted and untainted assets. And that was a line, while the defense bar had its druthers, was a line that was accepted by the court. The government proposes now to move that line and essentially make the line disappear altogether. Justice Alito. I don't want to waste up your rebuttal time, but I do want to ask you two quick questions about the statute. First is, did you raise anything about this in your cert petition? And the second is, is there a way to limit this to the Sixth Amendment context? The answer to the first question is no. In our cert petition, since we were constrained in the Eleventh Circuit by the interpretation that had been given back in 1999, we focused on the constitutional issue in order to suggest to the Court that the doctrine of constitutional avoidance should be triggered because there's a Sixth Amendment problem. The Eleventh Circuit has concluded that the statute's ambiguous. You didn't say anything about constitutional avoidance in your cert petition, did you? That is correct. We argued that the Constitution would be violated, and because this Court, in its discretion and indeed in the Rumsfeld v. Fair case, looks at a statute, even if the Court has considered those competing interpretations in order to avoid the constitutional issue. Justice Scalia, in response to your question about property, it sure sounded to anyone who heard the argument and read the opinions in Monsanto and Kaplan v. Drysdale that it was much about property. The government, by invoking the taint theory, which does date back to the founding of our nation, taints a particular subject, and that is the tainted asset. That's why it's called the taint theory. It's counterintuitive to suggest that untainted assets should be treated as tainted assets. And because, as I used the word earlier, there must be a coexistence between the taint theory and the right to counsel of choice. Monsanto drew the line. Kaplan and Drysdale drew the line and said if the government can establish that the asset is tainted, it can be frozen. Nothing about Monsanto, nothing about Kaplan and Drysdale suggested that assets over which the government has no present property interest, no relation back theory, no taint theory to speak of, can then take Aunt Sally's money or a client's pension funds needed for representation to use those assets to retain counsel. Nothing in this Court's precedent in those cases suggests that. And naturally, as a member of the Defense Bar, we would welcome a revisiting of Monsanto and Kaplan and Drysdale because the parade of horribles is here today. The government says, quite candidly, there is no line. If the fine is a million dollars, the defendant has to pony up, ante up a million dollars up front in order to exercise his right to counsel. The right to counsel of choice will have a price tag, and it is whatever the government says the maximum fine is, whatever the maximum restitution is, that will be the price that the defendant must pay in advance. It's an advance fee that the defendant must pay, according to the government, in order to be able to exercise his Sixth Amendment rights. We ask the Court to reject such an interpretation. Roberts. Thank you, counsel. The case is submitted.